Good morning. May it please the court. Robert Urbanski for the state. I'd like to reserve five minutes of my time for rebuttal. The Eighth Amendment claim at issue before this court involves the very same rule fashioned by the very same judge in the same district court as the rule at issue in Jones v. Davis. It is the same rule that this court found to be barred by Teague's anti-retroactivity doctrine in Jones. This case presents nothing new for this court's consideration, and it should reach the same conclusion that it did in Jones. The conclusion in Jones meaning Teague, or the conclusion in Jones meaning failure to exhaust? The conclusion of the majority of the panel in Jones meaning Teague, Your Honor. Are we bound by that? Yes. Getting there that way, we're bound to reach Teague first? No, Your Honor. This court could resolve this case on any number of the grounds that the state has set forth, so I don't believe the court is obligated to necessarily address Teague first. Which do you advocate? That this court do resolve the case, should resolve this case on Teague grounds. It would seem to be the most efficient way to resolve the case given the, if the court decides the case on Teague grounds, it is bound by the panel's decision in Jones. Let me ask you this, though, about Jones. Since Jones, the Supreme Court's decided Welch versus U.S. and Montgomery versus Louisiana, among others, and given the reasoning of the court there, isn't the point made by Judge Watford in his concurrence in Jones v. Davis now accurate, meaning that the claim is substantive, not procedural? By substantive and procedural, I mean procedural rules bear on the accuracy of the conviction and sentencing, whereas substantive rules make certain that state conduct is illegitimate regardless of its accuracy. So, if the finding is you cannot execute someone in California because of the systemic failure, the fact that you're not going to execute somebody as Judge Watford says, it can't be more substantive. When I read Jones' statement, I don't think it's made out without these intervening cases. We are clearly bound by that. But, as you know, under Miller v. Gammie, if the reasoning of that case has been superseded, then we have a different situation. Would you comment on whether Welch and Montgomery should play a role in our analysis of whether Jones v. Davis has been overturned effectively because of the change in analysis? Yes, Your Honor. Your Honor correctly identified the definition of a substantive rule in this case, and the Jones Court, Jones panel, correctly determined that the rule is not a substantive one. As Your Honor noted, a substantive rule is one that prohibits certain punishment for certain conduct or for a certain class of defendants because of their status. Here, the District Court's rule did not place any conduct beyond California's ability to punish by death, nor did it prohibit punishment for any class of defendants because of their status. The decisions of the Supreme Court that have issued since this Court decided Jones do not alter the Jones majority's analysis, turning first to Montgomery v. Louisiana. In that case, the Supreme Court applied the very same definition of Teague and the very same definition of substantive rule that the Jones panel majority did, albeit to reach a different conclusion. In that case, the Court addressed the Miller v. Alabama rule that mandatory LWOP sentences for juveniles violate the Eighth Amendment. The Court found that to be a substantive rule, and its reasoning was that Miller v. Alabama rendered LWOP an unconstitutional penalty for a class of defendants because of their status, the class being juvenile offenders whose crimes reflect the transient immaturity of youth. Let me just stop you just for a second. I don't want to ruin your train of thought, but in this case, you've got a claim that the system is so arbitrary that it's like lottery. Isn't that somewhat akin to the Miller situation? No, Your Honor. I think that that is a significant distinction right there, the fact that the class is defined as all defendants sitting on California's death row. Additionally, however, the District Court in this case actually at no time suggested that its rule was a substantive one. Its decision reveals quite the contrary. At excerpt of record page 10, the Court noted that the state's decision was a substantive one. The District Court's complaint here was with the process. It did not render death an inappropriate punishment. It took issue with the process that follows a jury's lawful imposition. Are we bound by the District Court's failure to engage in the substantive procedural analysis there? In other words, if he treated it as being procedural, but we now have new Supreme Court law, if we decide it's going to be substantive, are we bound by the fact that the District Court didn't have the benefit of that? Meaning the Montgomery and Welch? No. Certainly, if those cases change the analysis, then this Court is bound by those decisions and not what the District Court held. Here, the District Court did not apply any rule to any class of defendants because of their status as the Court did in the Miller v. Alabama case. There was also the Welch v. United States decision. In that one, the Supreme Court addressed its previous Johnson decision in which it struck down the residual clause of the ACCA as void for vagueness. In Welch, the Supreme Court also held that that was a substantive rule and the reason being that by striking down the residual clause, the Johnson decision changed the substantive reach of the ACCA. The residual clause could no longer punish any conduct. That's not a procedural rule. It affects the underlying reach of the statute and the conduct that it can punish. It does not alter the procedures by which the statute can be applied. I respect your argument, but you read, of course, Judge Watford's concurring opinion in Jones. Adding Welch and Montgomery to the mix, in what way was his analysis about procedural versus substantive rules inaccurate? It is inaccurate in the sense that it misinterprets what the Supreme Court has failed to do in what is found to be a substantive rule, which at its core, it has to prohibit conduct or punishment, or punishment for certain conduct, or punishment for a certain class of defendants because of their status. We do not have a class of defendants here in this case that shares that. Unless you consider all of the people who have been condemned to death in California as being such a class because they are all subject to what the district judge, I guess, considered basically a random, arbitrary, lottery-type system, there's a greater chance of dying in prison of old age than there is of being executed. Why is that different? I didn't understand anything in Jones to be peculiar to Jones. I understood that Jones was simply part of a larger class and that Judge Carney, in that case, had decided that the entire class was subject to these, the entire class was suffering under the same problem. That's correct, Your Honor. So there are really two problems that are at issue there. The first being that if we define a class, if the court defines a class in that manner, it would be the first time that any court has identified a class really in that manner. But isn't that what was done in Jones in the district court? Correct, Your Honor, absolutely. But we take issue with the way that the district court identified or how Ms. Alfaro characterized it. But our court has not reached that question on the merits. Correct, Your Honor. Correct, Your Honor, absolutely. So why isn't that, just to follow up on Judge Smith's question, why isn't this a class? This isn't a class, Your Honor, because it does not fall within the parameters of what has traditionally been recognized as a class under Supreme Court jurisprudence. The groups of people who have been identified as a class are the intellectually disabled, they are the insane, they are youth. You mean a class for Teague purposes? Because we certainly have recognized classes of prisoners on death row or classes of inmates. You don't mean that. No, Your Honor. Specifically for Teague, it hasn't. And what is a substantive, what can be a class for purposes of making a rule a substantive one? Well, I'll grant you that hasn't happened, but I'm not hearing an answer to why it couldn't. What's wrong with identifying the class this way? If the court were to identify the class that way, we have to go back to what the district court ruled to begin with, what its rule was. And its rule was that California's process takes such a long time, and so few people are ultimately executed, that it is an arbitrary one. So if we identify the class of defendants as all of those subject to an improper procedure, then we have really transformed a procedural rule into a substantive one, and there isn't a Teague exception anymore. All of those rules, any procedural rule, where you can identify a class of people subject to that rule, would become a substantive rule for Teague purposes. So for purposes of our analysis, the fact that Judge Carney focused on the fact that it was the long procedure that created the problem, even though it affects all these people, don't we still get back to the fact, though, that at the end of the day, if his ruling were to be extended, it would affect all of the people on death row in California, right? That's correct, Your Honor. So that gets back to the class issue. I respect the fact that he spoke in terms of procedure, but as Judge Watford suggested, when you're talking about death or no death, you can't get more substantive than that. And what do you think, you're very articulate, and I know you've talked about this a little bit, but if I said, please give me your very best argument as to why Welch and Montgomery don't change our analysis under Jones as to whether what Judge Carney came up with is a substantive or a procedural rule. What's your best argument? Slightly different responses with each case. Okay. But with respect to Montgomery v. Louisiana, the reason is that we do not have a class of defendants here like juvenile offenders. With respect to Welch v. Louisiana, we do not have Judge Carney's rule prohibiting punishment for any particular conduct. California's death penalty still reaches the same conduct. It still reaches the same defendants. The problem that Judge Carney identified is with the process that follows a lawful conviction and a lawful imposition of sentence. And that's not to say that if California didn't do something and alter its process to Judge Carney's satisfaction, that he wouldn't reach a contrary decision and that California could continue with its process. So the fact that if the state changed the rule, for example, we have, I think, a proposition at 66 or something like that where they're trying to speed up the hearings. If that occurred, then of course there would be less of a waiting period, theoretically. Is that the kind of thing you have in mind? Absolutely, Your Honor. And Judge Carney does not seem to bar that. But doesn't that suggest that in the future, California may be able to execute people because they would not be subject to the same Eighth Amendment infirmity that Judge Carney found in Jones. But there's nothing that California can do to alter the status of those people who have been on death row for the last 25 years or so. And I think Your Honor's question illustrates the problem with the rule at issue here and its novelty. The rule would apply across the board to somebody who had been on death row for one day or for 25 years. And the Eighth Amendment has simply never been extended in that kind of fashion. But to read Judge Carney's opinion on its face, it does not at any point suggest that we're some new system to replace the old one and one that satisfied these problems. If we were to get to the merits of Jones, that might be a limiting principle. It might be a way of cabining Judge Carney's decision. But there's nothing that the state can do to alter the fact that these people have been on death row for 25 years or more. Which illustrates the problem and the reason why Teague exists and the reason why we can't force California to have a crystal ball to have interpreted the Eighth Amendment in the manner that the district court suggested here at the time of Salfaro's conviction became final. Unless the court has further questions at this point, I'll reserve my remaining time. I would like you to go ahead and address now, please, the exhaustion question. Certainly, Your Honor. And I will allow you time for rebuttal. Thank you, Your Honor. So clearly, Ms. Salfaro did not present this claim to the state court and she does not satisfy either of the exceptions to the exhaustion requirement. With regard to the first exception under B1B1, she still has state corrective process available. She can file a successive petition in the state court and the California Supreme Court has noted in People v. Seamanu that its doors are open to hearing this claim. With respect to B1B2, Ms. Salfaro has not demonstrated that the state process is ineffective to protect her rights. Neither the petitioner nor the district court has provided this court with any reason to conclude that the California Supreme Court has done anything other than entertain and carefully consider each one of the claims that she has presented to it. The petitioner has cited the Coe and Ocutt and Phillips line of cases in support of her argument, but those cases do not support her argument because in each of those cases, the petitioner had a pending claim in the state court and through no fault of the petitioner's own, the state court would not resolve the claim such that there was inordinate delay in the petitioner's case. We don't have that here. Ms. Salfaro also claims futility, however, as we've argued in our brief, that is a doctrine that cannot survive the Engle decision from the Supreme Court and the idea being that petitioners cannot bypass the state system simply because they think a state court will be unsympathetic to their claim. That deprives the state court of the opportunity to consider whether considering the particular case before it, the claim is one that is meritorious. If you allow a petitioner to proceed directly to federal court on a claim that is never presented to the state court simply because a petitioner predicts or speculates that the state court will reject the claim, then that's a violation of the core principles of AEDPA, which require that the state courts be the central forum for entertaining constitutional claims. In addition, that petitioner would be able to get around the 2254D deferential standard because there would be no state court decision on the merits for this court to defer to. And those are significant problems under AEDPA. Okay. Why don't you reserve the rest of the time. Thank you, Mr. Bansky. Mr. Weinstein? Good morning. May it please the Court? I'm Michael Weinstein from the Federal Public Defender, appearing on behalf of the petitioner appellee, Maria del Rosario Alfaro. Your Honors, in 2015, the District Court analyzed an extensive set of unchallenged empirical evidence and concluded that there is a constitutional crisis in California. The District Court specifically found two different constitutional violations. First, in violation of Furman, the death penalty system is not being administered in an even-handed manner. And second, in violation of Gregg, death sentences and executions do not measurably advance either deterrence or retribution. Now, in an effort to block federal merits review of these very important federal questions, the State has asserted three different procedural defenses, none of which is valid. I'd like to take each up in turn, beginning with Teague, since it took up so much time during my friend's argument. The State's position is that Jones is still good law. We disagree. In Jones, this Court held that if a rule has a procedural requirement or a procedural component, then it is therefore procedural. But Montgomery rejects that. Judge Smith, as you were saying, Montgomery says that even if a rule has a procedural requirement to it, it is nonetheless substantive if it limits the State's ability to impose a certain punishment. And that is exactly what the District Court's decision did in this case. Before the District Court's decision, the State of California could sentence people to death and execute them. Your understanding of Judge Carney's decision in Jones, because we have to distinguish between the two Jones cases, that the death penalty is does that end the death penalty in California? No, no, no, no, not at all. Is it for those who have previously been in the system, but not for people who might be sentenced in the future? I view Judge Carney's ruling as applying to everybody who has been sentenced to death under the current statutory scheme. Because the current statutory scheme has two different constitutional defects. One, it doesn't have in place those constitutional safeguards that are necessary to ensure that the death penalty is being administered in an even-handed manner. And second, because of delay that is attributable to the State, the death sentences and executions will not measurably advance deterrence or retribution. Now, if the State wanted to go back and rewrite the statute and put in place those better fund the system to cut down on delays in the appointment of counsel, cut down on the backlog of cases in the California Supreme Court, then we would have, we'd be in a different position. But that's not the statute that we're dealing with. We're dealing with a very different statute right now here. And that's the one... So anybody sentenced to death under the current statute is entitled to Jones relief? Yes. And let me explain why. Even if they've only been in the system for a year? Exactly. Because one of the constitutional defects that Judge Carney identified is the lack of And we know that there aren't these safeguards in place because you have a very trivial number of people whose cases are moving through the system much faster than others. For instance, right now in California there's about 750 people on death row. Only 20 of them have completed the post-conviction process. That's something like 3%. And these people, their death sentences range from 1981 to 1989, and there's no discernible reason why their cases move through the system faster than anybody. So they're at substantial risk right now for being the only people in California that realistically face the possibility of an execution. And everyone who is sentenced to death in California, regardless of whether you got there a day ago or 25 years ago, is still at substantial risk for being one of the unlucky few who realistically face the possibility of an execution. And I gather that that's what Judge Watford had in mind in his concurrence when he said that it can't be more substantive when it would block death for a class of people. Exactly. Because under Montgomery and Welch, if a class of people has to pose a punishment, then it's substantive. It's really that straightforward. And Judge Watford had no problem recognizing that the class of defendants in this case was a class for Teague purposes. And that actually brings me to the next part of the Jones decision from this Court, because there's a second aspect of it that's been invalidated. So in Jones, this Court held that for a class of persons to be a class under Teague and to be affected by a substantive rule, that class of defendants had to be united. And we know after Welch that that's no longer true. Because the class of defendants affected by Welch, or actually affected by Johnson, which Welch held to be retroactive, that class of defendants wasn't united by some immutable characteristic. They were united solely by virtue of the fact that they had been convicted and sentenced under the same statutory scheme. And that's exactly what unites the people in California that are on death row right now. So our view is that under Montgomery and Welch, Jones is no longer good law. And under those decisions, a rule applied by the District Court is a substantive rule that can be applied retroactively on habeas. In your view, then, Miller v. Gamme would permit our three-judge panel to, in effect, overrule Jones v. Davis. Yes. Given that this Court's decision, Jones is now clearly irreconcilable with two intervening Supreme Court decisions under Miller v. Gamme that's permitted. Now, unless there are any further questions, I would like to turn to the issue of timeliness. So we've advanced two different timeliness theories in our brief. I'd like to focus today on our newly discovered evidence theory, because the State's reply brief raises some questions about that. So under EDPA, the one-year statute of limitations for a claim based on newly discovered evidence, which is what we're arguing here, it begins to run on the date that the claim was discovered or could have been discovered through due diligence. And under this Court's precedence, due diligence means reasonable diligence, not maximum feasible diligence. And I'd like to explain why we would have had to exercise far more than reasonable diligence to discover this claim before June 2014. So June 2014 was the month in the year that the Habeas Corpus Resource Center, who represented Mr. Jones in his case, filed declarations and made a claim that we're basing ours on. The data about the delay. Exactly. Let me ask you that, though. Those data appear to have come from public sources, did they not? They did. So you kind of have a rolling situation. It's not like the information was secret or difficult to find. It's available from public sources. Indeed, if you put it on Excel, you could change just a little bit, and it would be very simple to update it, right? Well, that's where I'll actually disagree with you respectfully, Your Honor. What HCRC did, and this is reflected in Michael Lawrence's declaration. He used to be the Executive Director of Habeas Corpus Resource Center. What he ended up doing is he and HCRC surveyed over 900 capital cases that spanned about 40 years of California jurisprudence. They had to check dockets. They had to pull briefs. I'm echoing. Is there? No, you're fine. Oh, okay. I'm sorry. So they had to check dockets. They had to pull briefs. They had to consult disparate databases. None of this is new, counsel. None of this is all in the public record. It was all available. Exactly. But the inquiry is how much diligence would it have required to discover all that information and put it together? And what HCRC had to do was actually engage in this Herculean effort to compile all this information, gather it, cull it, and then synthesize it into data. That just doesn't sound to me like the due diligence required to discover new evidence. When we're talking about, you know, did we find a knife? Did we get some DNA evidence? Something else. That's what it's always been in the past. Do you have any case where somebody has taken something new like this and said, gosh, I couldn't do it because I didn't have the resources that they had? No, no, I don't. But two things about this argument. Okay. I just want to establish then, this is a very novel argument that you're making. I appreciate the candor, but it is a novel argument. Yes, but I think that if you were to look at some of the cases cited by the state, for instance. So what if in another case, somebody said, gee, I found I had a really good paralegal or I had a really good intern from law school came and discovered a whole bunch of cases that nobody's ever seen before that give me this novel Eighth Amendment argument. And they prevail. And then somebody in the next case says, gee, if I'd had a good intern, maybe I could have done it, too. But through due diligence, I couldn't have had that intern. What's the difference? Sure. The due diligence inquiry under, I think, Ford v. Gonzalez is a fact-specific inquiry. So you need to look at exactly what the person had to do in order to engage or in order to discover this information. And I think something that's really important about HCRC is the fact that they had a statutory duty to gather this information. Under California law, they have to report on the functioning of the death penalty system. Why does that help you? The question is not whether they had a duty to discover it. The question is why your client didn't. Right. Right. But it's because for a ordinary petitioner or an attorney representing a single person to gather this information, they would have had to exercise far more than reasonable diligence to do it because they wouldn't be able to devote the resources. They wouldn't be able to devote the time. Does it matter what the it is that's being discovered? It can't be. Part of your problem is that what's being discovered is this really long delay. And that wasn't new news. Right. It's the arbitrariness. That's your argument. It's more than that. You have to sift out the reasons for the delay. What exactly is it that was discovered that allows you to win your argument and your view? So what happened in 2014 is that's when the specific effects of California's death penalty system became known on a widespread. I mean, certainly everyone knew that there was delay. So what specific effect are you looking at? That the California system had been worsening in the six years since the commission had issued its report and submitted its recommendations. Well, worsening meaning more people on death row. Greater delay. And then we also what we also see between 2008 and 2014 is that we see that there is a continuance of these people whose cases are proceeding through the system faster than others and for no discernible reason. So it actually goes to both. It's both the Furman theory and the Gregg theory. I think your delay argument is a very heavy lift. Can you talk to me about the arbitrariness argument? It seems to me that is something that sifts out maybe from the numbers. This is a really tough argument for you. I want to just give you a little chance to address it, please. But what exactly about our arbitrariness argument? You have to show what was discovered, what's new. And the notion that it's the delay seems to me to be just inherently problematic because that's so readily available to you. So there's something else that's sifted out, right? That people had to dig deeper to get to the arbitrariness that some people's cases were advancing more rapidly than others and whatnot. So can you talk about that? Well, exactly. I mean, that's one of the things that HCRC was able to identify to help the district court reach the conclusion, which is that you have the select number of people. I can't remember what it was in 2014. I think it was 17. And HCRC looked at their cases to see, well, is there some discernible reason why these cases have moved faster than others? And they couldn't find that. And that's the information that became known. So to get that, you have to, forgive me for interrupting, but to get there, you have to look at the case number that tells you, right, the onset, which seems to me very readily apparent. And then you have to look at the, at least the most recent docket entry, maybe not go through the files at all, but look at the most recent docket entry to figure out what the status quo is of that case, right? Correct. Go ahead. Oh, I'm sorry. But then you have to compare to everybody else's cases to see, okay, was there something that distinguished this case from everybody else? Because if everybody's cases are being delayed in the same manner, then we don't have this arbitrariness problem. Okay. Right. And so the number of people on death row is 750 about right now? Right. So that's the number that I've been using with my clerk anyway. About 750. Is it just those two data points that tease out your stronger argument about the arbitrariness with which some folks are proceeding through the system? The unlucky few that we that are facing execution right now? Yes. The 20 people that have completed the post-conviction process. But isn't Judge Bybee correct, though, in when he asked about whether the good job as HCRC did, the reality is this is not new evidence. It has been presented, put together. It's there. If someone were going to gather it and you had the good research person or whatever or law school classes or innocence projects or whatever it might be, it's a question of resources. But that doesn't make it new, does it, for purposes of our analysis? Well, no, I do think it makes it new and for two different reasons. First, I think maybe a helpful analog is in the environmental law cases because there's statute of limitations in those cases, too. So let's say that you live in a community and you know that there's pollution in your community. You can smell it. You can see it. You go swimming in the lake and you can actually feel it. But you don't know the full extent of the effects of that pollution until the government issues some kind of report. And HCRC as a state agency, this gets back to the duty component that I was talking about earlier, had a duty to report the effects and the functioning of the death penalty system. And I view the declarations and the exhibits and the data that they culled to be essentially an unofficial government report. It's not the duty because everybody represented on death here with a duty. And so if I'm walking around in a polluted environment, I'm sort of on notice, but I don't really have the resources. I don't have the science. I don't have the pocketbook to go hire the scientists. And it seems to me that's your argument. I've heard you say both things, of course. But if it's right that there's this limited pool, 750 people, and what had to be gleaned from the files is just two data points, that's not really akin to the science it takes to figure out why the river is brown. Right. So can you get to that part, which is it's not the duty, I don't think, it's the diligence of whether it was learnable without an inordinate effort. Right. And that's what I was trying to make, the point I was trying to make earlier, is that it's not just that you see that there's 20 people and 750 people. You still have to compare those 20 people's cases with the other 750 people. Because if there is a penological reason that you can discern from all the dockets and the briefs for why those 20 people moved through the system faster than others, then we wouldn't have this arbitrariness issue. But that's why I asked about what it has to be discerned. If you had to go through 750 death penalty cases and read the file, read the record, that's one thing. But isn't it two data points? It is two data points. To determine that you've got 17 outliers that are, you're calling the unlucky few, I don't want to be glib about this, it's a very serious business, but to get this subset, right? And then at that point, do you have to drill down? Is that your problem? From that, you just know that there's a subset that's moving through much more rapidly, or has moved through much more rapidly, but you don't know why. Yeah, exactly. And that's why you need to look at all 750 cases of people on death row to give meaning to those two data points. Without reference... It gets back to the same problem. If you've got really, really good research people who can use the data presented in interesting ways, you want us to treat that as newly discovered evidence. That would open up a can of worms like you wouldn't believe, not just in capital cases, but almost any kind of case where EDPA could apply. Because then you just hire some really smart people who can present things in a particular way, and whoop, it's newly discovered. But as my two data points, when I came to California a long, long, long, long time ago, people were still talking at the very early point about what a long delay there was for California death cases. It's gotten longer, there are more people, but the issue has been there forever and ever. It's not a new thing. You're presenting it in an interesting and compelling way, but it's not newly discoverable evidence, at least as I understand it within the statutory concept. What am I missing? I think you just have to engage in an objective inquiry to see if somebody could have found this information with reasonable diligence. And I think the cases cited by the state in the reply brief... The public defender's office was not surprised that people on death row were taking a long time to have their cases resolved, right? This didn't come as a surprise to you, did it? No, it did not. It didn't come as a surprise to me, and I don't see these cases nearly as much as your office would. We also didn't know the full effects of the dysfunction in California, though, until HCRC presented this information to us in the Jones case, or presented the information to the public. I would like you to get to the question of exhaustion. Thank you very much. So, AEDPA expressly provides that a petitioner does not have to return to state court if the state court process will be ineffective to protect their rights. And there are two circumstances in particular here that render that state court process ineffective. The first is that Alfaro will almost certainly face inordinate delay if she returns to state court. Because the average time to resolve an exhaustion petition is 3.2 years, or at least it was in 2015. It's probably increased since then. There were about 176 pending habeas cases in state court in 2015. I think it's grown. And there's about 400 pending capital appeals. That's in addition to the 8,000 cases that the California Supreme Court has to sit through on a yearly basis. All of that's true. But the fact is that the California courts are not going to permit the person to be executed during the interim period. And that's ultimately what you're trying to stop. Secondly, you've got a situation, particularly after the Sumano decision, particularly the newly constituted California Supreme Court is very different with respect to capital cases. There's likely to be a whole lot more. Ms. Alfaro's petition is not dead on arrival. You don't know what's going to happen with it. And so far as I can tell, the Supreme Court has made it very clear that your fear that the court may not agree with you is not enough to say that it's futile. Isn't that correct? No, I disagree. And your question actually raises two different points. I'd like to take them up in parts. So the first is there's a difference between the relief that Alfaro is seeking and the injury that she suffered. And that gets confused in the brief sometimes. So by requiring her to go back and spend, let's say, three years in state court, what it's going to do is it's going to exacerbate the constitutional injury she's already suffered. And that injury is two-fold. First, we know from documented studies that every day spent on death row is a day that exacts a frightful toll on a person's mental, emotional, and physical well-being. And as some of the excerpts of records show, the suicide rates for people on death row are astronomical compared to the general population, 25 to 30 times higher, I believe. So she's already suffered 25 years, or she's already been on death row for 25 years. If she is serving an unconstitutional sentence, which we believe she is under California's current dysfunctional system, then that's another three years that she's going to have to spend on death row. And that's going to compound the injury. You say that because you think that if she were given life without possibility of parole, she would be paroled, or what? No, no, no. I mean, if she was given life without parole, she would be in prison. But it's the effects of having a... She wouldn't be subject to death during that time. I'm sorry? She wouldn't be subject to death. She wouldn't be subject to death. And the death sentence hanging over somebody's head is what causes its mental anguish. The second component, too, about the injury that she's suffering... Excuse me. I thought your argument was that it's the uncertainty of the imposition of the sentence. It's both of those two. So for instance, Alfaro, and I say I'm running out of time. You're okay. I just took a little of your time. I just want to make sure that I understand. You're making both points? I want to make both points. So two points about the injury. So I've gone to the first. You know, with Alfaro, part of it's the uncertainty of the fact that she's one of 36 people that were sentenced to death in 1992. And at the time of the district court's decision, her case had moved through the system faster than anybody else's. And so she's left there wondering, what makes my case different than everybody else's? Why am I not being treated similarly to similarly situated people? So that's part of the component. That's the mental emotional anguish that's caused by living on death row. The second component is that she's already spent 25 years now waiting for a day in federal court to prove other claims, her guilt-based claims, for instance. And if we send her back to state court, that's another three, four, five years that a federal court will not hear her guilt-based claims. And that's important, because with each passing day, more witnesses are dying, memories are fading, evidence is being lost. So the passage of time further diminishes her right to a retrial. She can abandon the claim, right? She can abandon her, the Eighth Amendment claim? Her Jones, yeah, her Jones claim. Well, that's a possibility. That would speed things along and get you back to the merits. But then that would be forcing her to choose between two different constitutional rights, which I don't think the Constitution allows. Right. But if she wants to bring a new claim, then there's going to be additional delay. And then she can't complain that the system has delayed her sentence. This is, I mean, the irony here is pretty striking. I understand there's irony on both sides, but the irony is pretty heavy. So it seems to me there's one component of this that's very, very troubling, which is the delay, a multi-year delay to get a lawyer to get it started, right? Especially if you have a guilt phase argument. But that is qualitatively different than the kind of claim you're talking about now, which goes to Judge Bivey's point. Complaining about delay, but you're adding a claim that, of course, will increase the delay. Correct. That's a pretty tough sell. Well, it's the two different injuries. If you want to separate out one and say that she's inviting the delay in her case, actually I don't know if that's a correct way to characterize it. Because if the California State is the one that's administering the death penalty in an unconstitutional manner, then we shouldn't be faulting her for raising these viable claims in federal court. I think we understand your argument. We certainly all read your brief very, very carefully. But it does seem fair to give you an opportunity to respond to kind of the obvious, if you take it up to the 30,000-foot level, which is that you're fighting, fighting, fighting, the imposition of the death penalty, and then arguing that the delay is violating the Eighth Amendment. Correct. Right. So inherently, I think that's what Judge Bybee's question gets at, and if it doesn't, it's mine. Do you want an opportunity to discuss that? Well, would you mind rephrasing your question a little bit differently? I'm not sure that I have a question. I'm just trying to make an observation that inherently you've got a problem here. When you're talking about the harm being the death penalty hanging over somebody's head, to use your phrase, it is also true that by all of the extraordinary efforts that you're going to on behalf of your client, including adding this claim, that inevitably that increases the delay. That's correct. But it's important to see what is the cause of the delay. The cause of the delay is this broken system, the system that's not appointing counsel in a timely fashion, the system that's not timely moving through these cases, the system that's denying people their right to access the courts. That's what makes this case, I mean, I understand why facially it may seem sort of ironic, but since the state system is the constitutional injury and the center of the constitutional claim, I don't see any irony at all. Judge Smith, there was another question that you had. I don't think I fully answered your question. So I'd like to have the opportunity now. I forgot it. I'll allow you to answer the question. I think your time is concluded. Okay. Well, thank you, Your Honors. Thank you. Thank you very much. Counsel, if you wanted to answer Judge Smith's question, I'm going to give you the time to do that if you'd like to do that. Yes, but over the course of that discourse, I forgot what the question was. That's okay. Thank you very much. This is the kind of case we could have questions ad infinitum because it's very important. It has a lot of complexity. Thank you, Your Honors. Thank you, Mr. Weinstein. Mr. Bansky, you have time remaining. Thank you. I think I have just four, hopefully, brief points on rebuttal. First, on the Teague issue, this panel is bound by the Jones majority's decision to find the issue Teague barred on that issue. The intervening Supreme Court cases apply the same Teague framework that we have always had. There is nothing new for this Court's consideration on Teague. Secondly, briefly on the timeliness issue, I just wanted to point out that the due diligence argument is Ms. Jones' alternative theory on the timeliness argument, and her other theory really shows the untenable nature of this argument. She also argued that her Eighth Amendment issue is tied to the same common core of operative facts as was raised in her timely file petition. Of course, she cites to the procedural history for that notion, but while certainly one can have alternative theories, these seem to be diametrically opposed, where you have old facts that are the common core with your original petition, and then brand new ones that you couldn't have discovered until Jones in that case essentially put them together. Third, interwoven through opposing counsel's argument were aspects of the merits of the Eighth Amendment issue here, and I would simply note that this Court can only deny relief on the merits because the claim has not been exhausted in the State Court. It could not grant relief on the merits. And then turning finally to the issue of exhaustion, this is not delay for delay's sake to require Ms. Alfaro to return to the State Court. There are exhaustion rules, and they exist for a good reason. They exist to give State courts the chance to resolve issues impacting their final judgments in the first instance, and any future delay that Ms. Alfaro would incur from doing that and any consequences she would personally suffer, that starts to sound more like a lackey claim, which this Court has already found to be barred by Teague. And all of the discussion on exhaustion really illustrates why resolving this case on Teague grounds is the simpler, if there is such a thing in this case, it's the easier route for this Court to take. If there's nothing further, I would submit. Thank you, Mr. Manske. We thank both counsel for the argument, a very complicated case. Alfaro v. Johnson is submitted, and with that, the Court has completed the oral argument calendar for the day, and we stand adjourned.
judges: Bybee, M. Smith, Christen